If it pleases the court, my name is Lee Seaham. I'm here representing the appellant US Airline Pilots Association, or USAPA. It will be my intention to reserve two minutes for rebuttal. With respect to the issue of rightness, the plaintiffs contend that a union's mere adoption of a seniority integration policy is enough to give cause to a DFR action. The court said it would be the adoption of a proposal. However, at the time the complaint was filed, there was, in fact, no proposal. We submit that adoption of this standard would open the floodgates to federal litigation and cause a massive interference with the federal, in terms of the federal jurisdiction. At what point would this become right? When you finally get a CBA? When there is a single ratified collective bargaining agreement. Okay, so when you get a collective bargaining agreement. Now, if you can't get there from here, then what? This case would never become right. Well, and at this point, it looks like a war of attrition, doesn't it? Well, I would submit that we are wrestling with the same two major contingencies right now that ALPA was wrestling with under its own ALPA merger policy. One is ratification, and that's both a negative and a positive. The negative is, if it's not ratified, then we continue under the terms of the transition agreement, which mandate separate operations. But the other is a positive one, that, as you note, Your Honor, that it would appear, or has been through the stages, a war of attrition. But is there some package of better wages, benefits, domicile protections that would appeal to a majority of West pilots? Well, it's not so much a matter of whether you would appeal, but you had a process for resolving disagreements, which was to go to binding arbitration, which turned out not to be terribly binding. We had a process for creating a proposal that would ultimately be part of a larger package that was submitted to ratification. And under the ALPA v. O'Neill standard, where, first of all, we will defer to a union's interpretation of its own policies, and also give USAPA the benefit of the doubt in terms of analyzing the law and the facts that exist, after eight months of no negotiations, you have the ALPA national president saying there is no timetable, each MEC and each pilot group have the right to analyze the entire contract and look after their interests. And it was stipulated, it was stipulated that the MEC had determined that the East pilots would never have ratified it. So you had both the MEC digging in its heels and the East pilots, and you also had the West MEC resisting ALPA's importunities, perhaps to say, please mitigate, putting extreme pressure on the West MEC. Still on the rightness question. Yes. There is no case directly on point, is there? I would argue. I mean, a court of appeals case, right? I would argue, yes, the Seventh Circuit decision in Rakestraw, where in the context of the TWA and Ozark pilots, one of the bases for the decision was the Ozark pilots had voted ultimately for this collective bargaining agreement and start seniority integration proposal. And there was an argument there that, well, you can't hold that against the Ozark pilots. They were negotiating with a gun to their heads. But the Seventh Circuit said that was the vote. We want these issues to be resolved through political discourse and not through the intervention of the federal judiciary. And we're asking for the same opportunity in this case that was also recognized in the Gullixson case that even if there are some contentions about fairness in process or substance, ultimately that subgroup, if they approve it by a majority vote, that's the ultimate determination, not a class certification, as in this case, where we were deprived of an evidentiary hearing. I'm sorry, I'm still puzzling over Rakestraw. I apologize for being still back there with you. Okay. In Rakestraw, there was, I think, a ratification of the merger, was there not? The Ozark pilots did have a vote, which they said was unfair because they had a gun to their head. And the Seventh Circuit said, but it was a vote and majority of- Right, and so it supports you only by implication. The court was not called upon to decide what would have happened had there not been a vote. Well, I think it supports the fact that there is a major contingency that applies to this case, that we are entitled to proceed with our negotiations. This is an employee group- I just want to be sure I understood Rakestraw correctly as you were raising it. I'm raising it in the context of rightness and that there is a ratification contingency, both a negative one and a positive one. Okay. The negative one being- I'm now with you. I can catch up, I hope. Then I'll move on. And the other issue is, as Your Honor pointed out, maybe there never will be an agreement, which is the conclusion that ALPA was coming to, when ALPA, one month prior to its decertification, initiated what we call in the industry a section six amendment process in a letter from their president to the CEO of U.S. Airways saying, let's commence negotiations for two separate contracts and so that we can get the wages and benefits improvements for each group and in effect move forward with a fence, which is not unusual in the airline industry and Northwest and Republic had a 20-year fence because of the acrimony that these integration issues provoke. And that is another major contingency that ALPA was aggressively promoting, both in its election campaign before the NMB and its negotiations with the company. And now, unfortunately, we are under a court order that forecloses one of the major options that our predecessor was pursuing. Again, judicial interference in the negotiating process, which holds a promising alternative to endless acrimony. Speaking of the negotiating process, I mean, is there anything going on now? There are negotiations, yes. The case has been submitted to the National Mediation Board and it's still considering whether to accept the case. If we are before the National Mediation Board, that begins a process which the federal courts have described as virtually interminable because they can hold us in mediation as long as they desire. If I might move on to the merits, there is a triad of Ninth Circuit cases, which in our opinion, the district court turned a blind eye to. The fact that under Hasse v. Derrygold, a union may renegotiate seniority provisions even if they're retroactive in effect, even if they have an adverse impact on subgroups, that under Herring v. Delta Airlines in the Clayton Republic case, that this is a complex issue and so long as there is some rationale, the court should defer to the union's judgment. And the fact that in the Ninth Circuit, favorable observation of a leading commentator who held that date of hire is the preferable way to go. In this context, we asked for a definition of our good faith obligation as the Supreme Court and the Ninth Circuit in Beck defined it as substantial evidence of fraud, deceitful action, or dishonest conduct. And even though the judge had actually warned the plaintiffs in pretrial conferences, you have to show deceit. Later, when it came time to the jury instructions, he disregarded, the district court disregarded the Ninth Circuit precedent and said that we in effect had the burden of demonstrating a legitimate union objective. And having shifted that burden to us, then deprived USEPA of submitting evidence to demonstrate the legitimate union objective that had motivated every other union on the property. The IM, the flight attendants, and ultimately even the dispatchers all proceeded on a pure date of hire basis with no consideration of that impact on the juniority of certain segments of the West pilot group. USEPA is the only union that's giving special consideration to junior West pilots. But we were forbidden by jury instruction from making those arguments and we were forbidden, and the jury was forbidden by jury instruction from considering such things as is it legitimate for a union to consider the greater contribution that an employee has made to the company, or the investment of decades of his life, or the fact that a 50 year old pilot who has never made captain, as now has dwindling years and young pilots 15 years his junior who are gonna be forever over him up until and past the date of his mandatory retirement. And this is also a federal policy. This is a policy our nation recognizes in the context of the Age Discrimination and Employment Act that as people grow older, they have less job mobility. This is in the nature of a social compact unlike social security. Why do you look after the people who are older and as plaintiff counsel conceded, more experienced pilots? You take care of them because you're gonna grow old too. Because the plaintiff such as Mr. Wargacki who now has accumulated five years of seniority, if there is a merger with United Airlines or Virgin Atlantic, he stands to lose all his seniority too. But this is a union just like AFA, and just like the IM, and just like the TWU that says that's not right. We're gonna protect your seniority in future mergers just as we protected everybody's seniority in this merger. With respect to the legitimate union objectives, also, it's very clear one of the leading cases the plaintiffs have cited is Barton Brands. That's a case where a list was undone, but it was undone in derogation of seniority. There had been a date of hire list agreed to, ratified, implemented, and the sole reason was not to advance a legitimate union objective such as a date of hire, but to act in derogation of that bedrock union principle and put them under everyone else. But in the context of that discussion, the Seventh Circuit in Barton Brands recognized the National Labor Relations Board's decision in associated transport, as did the district court in this case, which said if a union, after a labor arbitration, after it entered into an agreement, and let me pause to discuss briefly the facts of that case, you had two union locals and a company agreed to be bound by the result of an arbitration that would be dispositively settled, that seniority integration of Binghamton men being integrated into the Scranton terminal. And they lived with this for four years. And the union, after four years, negotiated a change. They said we never agreed to that arbitration principle, that you're allowing Binghamton men to come in and take the jobs of Scranton men who have been working here from time immemorial. And the Seventh Circuit said we recognize that if there is a principle basis to address the outcome of an arbitration, a union is free to address that. That's not bad faith. And here, there was loads of evidence. It was that we tried to submit, evidence that the criteria itself had been manipulated specifically to hurt U.S. Airways pilots, that critical evidence had been excluded about America West's near bankruptcy, that a dissenting opinion of the three arbitrators who considered this said that the minimum standard of fairness had been disregarded in terms of honoring the attrition. It was fully anticipated that any U.S. Airways furloughees would be getting their jobs back because there were so many older pilots who were retired. So anyone who was on furlough was getting a job by the end of 2007 or certainly by the end of, before the hearing and the consideration was closed. And then finally, you have the DFR issue with the Nodler case where there's a pending case in the Eastern District that alleges that ALPA deliberately submitted erroneous information. But the district court said in so many words that the result doesn't matter. The process is all that we're gonna look at. In fact, instructed the jury, no evidence will be admitted to challenge the process, procedure, or decision of the Nikola Award. In a pretrial conference, he said of the arbitrators, they may be right, they may be wrong, but that was the deal. And that would be eliminating this precedent from the books if we were allowed, if we were to prohibit a union from considering all the wrong procedurally and substantively that occurred in an arbitration. I'm gonna try to reserve the rest of my time. Yes, you may do, I'm sorry. Can I ask him a question? Certainly, of course. But let me ask just one question. In the, in their 28J letter, right, your opponent cites this, it's an old case, but a First Circuit case, Teamsters Local 42, which holds that, you know, a DFR claim accrued two months before the union company held their final negotiating session. What's your response to that? Well, my primary response is that was not a rightness case. That was a limitations case, so that the, what the court was really charged with defining was what was the latest date at which that might have accrued for limitations period. But it was also a case where it says there's no rightness until the knife thrust has occurred, that we have to have, here there are contingencies of ratification, dual contract issue that don't. More contingencies than in that case. Yes, Your Honor. Thank you. Good morning. May it please the Court. My name is Andy Jacob. I represent the Addington plaintiffs, several of which are here in the courtroom today, and our class is also known as the West Pilots. This Court is well aware that under the Federal Arbitration Act, there is a time and a place to appeal an arbitration, and that time and place was not in the district court in this case. The Park Place case from this year established once again that there's three months to challenge an arbitration. The Comedy Club case this year established the standard on which an arbitration can be challenged. This case was not, should not be about the merits or the challenge to the Nicolau arbitration. That is what it is. We can make our argument for why Mr. Nicolau got it right, but that wasn't the issue, that wasn't what was tried. There's really two issues in this case. The issue is whether liability attached, if USAPA's sole actual motivation for adopting and promoting its date of hire seniority list was to benefit East Pilots at the expense of West Pilots. That's an issue of law. Judge Wake ruled correctly based on a long line of cases in the affirmative to that issue. There's then an issue of whether there was sufficient evidence for this jury to find that this was the sole motivation for USAPA. The jury is not required to believe any particular evidence. It had credible evidence that it did believe that it rightly inferred that the sole motive behind the formation of USAPA and its actions to adopt and promote this date of hire policy was to take a benefit from the West Pilots to the East Pilots. Counsel, obviously you think that this case is ripe. Why is that true in the absence of the end of the negotiations as distinct from during the negotiations? Ripeness doctrine by and large is applied to agency actions. It's not been addressed by the courts that much in this context, but- Well, it's kind of part of the case in controversy. If people have non-fixed positions, then we don't know if the projected harm will actually eventually result. That is correct, Judge Graber, but we need to look carefully at what is the question that the claim makes, we can't let the defendants define what our harm is and say that our harm hasn't come yet. Our harm is that we bargained before the Nicolau arbitration had a result. It was agreed on both sides that there would be an opportunity, in good faith, to negotiate a CBA using the seniority that came out of that. And in good faith to put that to a ratification vote. Our harm has already happened because there has not been this good faith negotiation of a CBA. So let me see if I can kind of put your argument in a slightly different context to help me think it through. If a union took the position that it would negotiate that all there would be an action against the union for its position, even if no contract had yet been signed. The Ramey case addressed that issue, where there's a clear intent of a union to breach the duty of fair representation. And it commits itself to breach that duty. The Ramey case said that it ought to be treated like a party to a contract who makes an unequivocal- An anticipatory breach. Commitment to breach the contract. You're not required to wait for the ultimate injury. Even where it is repudiation of a contract, yes, the aggrieved party might accept it somewhere down the road. There might be some adjustment. But if they choose to assert their action, when there's no question on the other side that they're going to repudiate their obligation, they have a right claim and they're allowed to assert it. The Ramey case wasn't addressing that directly on point because it was saying that, yes, the action accrues for rightness purposes, but our limitations don't necessarily run just because the plaintiff has the option to make their case. I can guarantee you that this union took office in April. And if we did not file our claim when we did, and we filed it in December, they would be standing here today saying, but we told you in April that we were absolutely not going to do that. You knew what we were doing. We were taking a bargaining position that you now argue was a breach of the duty of fair representation. And you waited more than six months. You're too late. You can't have it where you're always too early or too late. There has to be a right time. There's no question there was a controversy here. There's no question that we're the parties aggrieved by that controversy. All the facts that we allege that support our claim already happened. We don't wait for any future events to find out whether this union in the past tense advocated and made a policy in derogation of the Nicolau Award. That's what our claim is. If that's not a good claim, and we believe it is, and it was a good claim, that doesn't affect the ripeness. But that's what our claim was. Things that they've already done breach the duty of fair representation. Getting back to Ramey, though, Ramey says the claim doesn't accrue, right, until much later. That is true, but Ramey distinguishes that we use the verb accrue to mean two things. And in most cases, claims accrue for purposes of rightness and limitations at the same time. But they don't always. Kennedy, you cited to us this limitation case for rightness purposes, the Teamster case in your 28-J letter. Right. Now, that's, again, because that case, a claim has always accrued for purposes of rightness by the time that the limitations start to run. It doesn't necessarily have the limitations start to run at the first time that it is right. So that's a case that showed when the clock started to run for limitations, and that was before the final negotiation of a contract. The, whatever their language was, the knife that stuck in in that case was that union made a firm public announcement of what it was going to bargain for. It made that in November. Okay, what did it do in November? What was the act? That's distinct from stated future intention. What was the act? The union published a memorandum that they distributed to the workers telling them what they were going to intend to negotiate in the upcoming CBA with the company, and the court treated that as if the limitations began to run on that date, the claim would still be timely. The case then goes on and say it wasn't until January, two months after that, that they actually sat down and worked out the last details of the CBA. What do you make of this statement in Ramey, page 279? For these reasons, we do not require or even permit union members to bring a suit against their union. Simply because the union has announced its future intention to breach its duty. We do not require or even permit. The Ramey case. Page 279. Yeah, I'm sorry. Starts on 278, the paragraph. I'm just uncomfortable taking one part of that out of context. They're talking about, they're definitely recognizing in that case very carefully that when there is sufficient repudiation of the duty of fair representation. And in that sentence, I think that they're using their language to say there can be negative statements that are insufficient to trigger the ripeness of a claim. In this case, there's no question. This union is not saying, well, we didn't really make up our mind. We were still open to doing what you say we're supposed to do. Well, what in this case did the defendant do that was unequivocal that caused not only the statute of limitations to begin to run, but ripeness to occur? What did they do? What the defendant did is they stayed on their very clearly defined course of promising before the election that they would disregard the Nicolau arbitration. They drafted their constitution before April 18, but it was their constitution on April 18 that might as well have said, we will disregard the Nicolau. They appointed a committee of East pilots directing them to come up with a seniority proposal that would be distinctly different than the Nicolau. They repeatedly announced to their membership that they had every right to disregard it, that they were legally sound, that they were going to go ahead and do that, they finally presented it to the company. At trial, in this trial, the court asked them, do you have any intention under any circumstances to ever consider to honor the Nicolau arbitration, and they said no. They asked for a stay of the injunction so that they could go ahead and act contrary to their obligations. Nothing could be more unequivocal than what has happened here. Yes, they could have injured us more, but they injured us. I would also call the court's attention to the Haas case, the Herring case. The language in those cases, the language in the article by Kahn, if you just read the paragraphs that follow what's been quoted to you, those cases say a union can do this and do that, but, and then the but is they have to do it for proper reasons. As long as the union acts with complete good faith and honesty of purpose. The Haas case says that the equitable doctrine of estoppel, the duty of fair representation, constrain the union's power and right to renegotiate contracts. The Kahn case, the Kahn article defines what the gold standard in this industry is and makes it very clear that it is having in place a substantive and procedural policy that is formed, divorced from an actual controversy that will govern how we can reach a neutral, equitable integration in a merger. It rejects having categorical rules. It rejects saying that there's any standard that should always apply. It recognizes the principle that you look at the jobs that are brought to the merger. And when people come to the merger and they're on the list and they don't have a job, they're not treated the same. That's the standard in this industry. Thank you, Mr. Jacobs. There's a very small amount of rebuttal time remaining for you. Okay. Very quickly with respect to Ramey, aside from the fact that the proposal was first raised in 1992, it's a limitations case. There were no negotiations contingency because as reflected in the district court case, US Airways had told the IM, we'll take whatever you want. And if you'd look at, there was no ratification contingency in that case either. And if you look at footnote five of that case, that discusses that in the context of rightness, you'd have to look at the imminency of the injury. And in this case, aside from the contingencies we've discussed, there's also the fact of the only thing that USAPA has done is adopt definitively, is to adopt a hortatory constitutional objective that says we will maintain uniform principles of seniority and pursue conditions and restrictions designed to protect. What is your response to my hypothetical? Suppose instead of this constitutional provision, there had been one adopted saying that we will take the position in negotiations in the future that men will have seniority over women in this company that we are dealing with. Would female employees have a ripe claim at that point or not? And if not, why not? Being an experienced, if I may say so, an experienced labor attorney, I would say no. Because what the advice that was always given to our union clients is that your constitution has to conform itself to federal labor law. And that there are many times in union constitutions that there are unlawful provisions. And the unions don't, rather than go through a complex process of amending them, they simply don't enforce them. So nobody could make them unenforceable on purpose by suing at that point? Is that your position? What I'm saying is that, I'm not sure I understood that characterization. I'm saying the floodgates would open if every potential violation of federal law embodied in a union constitution were right for action, that this court would be much busier than it is. Let's leave aside the constitutional question. If a union simply took the position, we're in negotiations now with our employer. And they sent around a memo and they said, we're going to take the position in these negotiations that men should have greater seniority than women, and we have really good reasons for doing that. And that is going to be our position. No claim then until there's a collective bargaining agreement that might or might not embody that? There might be a Title VII claim, if there's some harassment component. No duty of fair representation claim. No duty of fair representation claim because there is a long negotiating process and there's a ratification process. And there's a political process which the courts are asked not to interfere with. Thank you, counsel. Could I just mention briefly that we have asked for a stay. We think we have raised serious questions and that litigating over such things as damages and attorney's fees would create a hardship for both parties, frankly, in terms of costs, if there's any chance that this decision would be made. Well, let me ask you, is there anything going on in the district court now? Yes. There's litigation over the attorney's fees, whether and how much USAPA should pay to the plaintiffs in terms of attorney's fees. And there's also an issue concerning the litigation. You mean a motion for fees? There are motions and there's also discovery going forward in terms of damages for the six plaintiffs. Did you ask the district court for a stay? Yes. And we were refused. And we have asked this circuit for a stay of those proceedings. Thank you. Thank you. Thank you. The case just argued is submitted. We very much appreciate the well-prepared comments from both of you.
judges: Tashima, Graber, Bybee